```
 1            IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF OHIO

 3                    EASTERN DIVISION

 4              ~~~~~~~~~~~~~~~~~~~~~

 5   REAL GOOD TECHNOLOGIES, LLC,

 6                 Plaintiff & Judgment

 7                 Creditor,

 8

 9      vs.            Case No. 1:17-cv-00149-DCN

10

11   VICTORY SOLUTIONS, LLC,

12                 Defendant & Judgment

13                 Debtor.

14              ~~~~~~~~~~~~~~~~~~~~~

15              30(B)(6) Deposition of

16              SHANNON BURNS

17            CONDUCTED VIA ZOOM

18

19


             September 9, 2020

20                1:02 p.m.

21              Taken at:

             Forbes Law, LLC

22            166 Main Street

          Painesville, Ohio  44077

23

24

25         Nancy L. Molnar, RPR, CLR
```

PLAINTIFF'S EXHIBIT
C
_____

Shannon Burns

```
 1    APPEARANCES:

 2

 3    On behalf of the Plaintiff:

 4          Bailey & Glasser, LLP, by

 5          MICHAEL L. MURPHY, ESQ.

 6          1055 Thomas Jefferson Street, NW, Suite 540

 7          Washington, D.C.  20007

 8          202.463.2101

 9          mmurphy@baileyglasser.com

10

11    On behalf of the Defendant:

12          Forbes Law, LLC, by

13          GLENN E. FORBES, ESQ.

14          166 Main Street

15          Painesville, Ohio  44077

16          440.357.6211, ext. 128

17          gforbes@geflaw.net

18                          ~ ~ ~ ~ ~

19

20

21

22

23

24

25
```

Shannon Burns

```
 1                  I N D E X

 2          EXAMINATION OF SHANNON BURNS

 3

 4      BY MR. MURPHY:                        4

 5

 6                  EXHIBITS MARKED

 7      Exhibit 1, 30(B)(6) Notice of         5

 8      Deposition,

 9      Exhibit 2, printout from the Secretary 6

10      of State,

11      Exhibit 3, printouts from the Victory 10

12      Solutions website,

13      Exhibit 4, notice of location of      19

14      property equipment,

15      Exhibit 6, Garnishee list of names,   33

16      Exhibit 9, Bankruptcy Form 202 for    46

17      Victory Solutions, LLC, dated March

18      12, 2018,

19

20

21

22

23

24

25
```

Shannon Burns

```
 1            SHANNON BURNS, of lawful age, called for
 2    examination, as provided by the Federal Rules of
 3    Civil Procedure, being by me first duly sworn, as
 4    hereinafter certified, deposed and said as follows:
 5                 EXAMINATION OF SHANNON BURNS
 6    BY MR. MURPHY:
 7       Q.    Good afternoon, Mr. Burns.  I'm Mike
 8    Murphy.  We met before.  Before we get started
 9    here on this 30(B)(6) deposition, I sent you a
10    copy of a binder.  It looks like it's sitting to
11    your left.  And I sent a copy to your counsel as
12    well.  We're all remote, but also looking at the
13    same documents.
14            I've got what's in the binder called up
15    on a shared screen in a single pdf and we'll
16    cross reference that as well, so I can direct you
17    to certain texts, but we're not videoing this
18    deposition, but we have the ability to see each
19    other.  But there will be a written record, so
20    we'll try to not talk over each other.  And we'll
21    have ourselves a clean record and Nancy will not
22    be ready to kill us both.
23            Are you ready to go?
24       A.    Sure am.
25                      -  -  -  -  -
```

Shannon Burns

```
 1    (Thereupon, Plaintiff's Deposition Exhibit 1,

 2    30(B)(6) Notice of Deposition, was marked for

 3    purposes of identification.)

 4                        -   -   -   -   -

 5    Q.    All right.  So we're looking here at

 6    Exhibit 1, which is the 30(B)(6) notice.  And

 7    have you seen this document before?  It's in

 8    tab 1 of your binder.  Specifically looking at --

 9    if you look at -- there's page numbers in the

10    lower right, the topics start at page 5.

11    A.    Okay.  Sure.

12    Q.    And you understand that you're a

13    30(B)(6) witness today, which means you've been

14    designated to testify about information known or

15    reasonably available to the organization on these

16    topics?

17    A.    Yes.

18    Q.    Okay.  And I didn't receive any

19    objections to the written topics.  I may get some

20    objections to some of my questions, but unless

21    your counsel instructs you not to answer, you

22    should answer my question to the best of your

23    ability based on information known or reasonably

24    known to you.

25          What did you do to prepare for today's
```

Shannon Burns

1    deposition?

2        A.    I just reviewed the requests that you

3    sent over.

4        Q.    Did you review any documents?

5        A.    I did not.

6        Q.    Okay.  How long did you spend reviewing

7    the deposition notice?

8        A.    I couldn't say.

9        Q.    Within an hour?

10       A.    Less than an hour.

11       Q.    Okay.  And other than this, you didn't

12   review any documents?

13       A.    No, sir.

14       Q.    Okay.  Based on a review of the topics

15   in the notice, are there any that jump out at you

16   that you're not prepared to testify to today?

17       A.    I don't believe so.

18       Q.    Okay.  Are there any other people who

19   would be more appropriate to testify as to

20   certain topics in this deposition notice?

21       A.    No, sir.

22                          -  -  -  -  -

23   (Thereupon, Plaintiff's Deposition Exhibit 2,

24   printout from the Secretary of State, was marked

25   for purposes of identification.)

Shannon Burns

```
 1                    -   -   -   -   -
 2     Q.    All right.  Let's look at topic 1 is
 3  Victory Solutions's Corporate Form, if I can get
 4  you to turn to page tab 2 in the binder, which is
 5  Exhibit 2, it's the printout from the Secretary
 6  of State?
 7     A.    Yes.
 8     Q.    Now, it lists Victory Solutions as a
 9  domestic limited liability company and that it's
10  still active.
11           Is that all current?
12     A.    That's correct.
13     Q.    Okay.  Now, it lists you as the
14  registered agent; and that's still the case?
15     A.    Yes.
16     Q.    Okay.  Are you, Shannon Burns, are you
17  associated with any other corporations or
18  partnerships or LLPs currently?
19     A.    There is a -- in January of this year, I
20  did start a different LLC that is nothing of any
21  consequence.  It's just an LLC that is not
22  operating.
23     Q.    What is that called?
24     A.    Honestly, I don't remember the name.  I
25  changed it a few times in doing it.  I have to
```

Shannon Burns

1  get back to you on what the name is, but it's not

2  even operating.

3      Q.    What's the purpose of the LLC?

4      A.    I thought that we were going to go out

5  of business, so I thought I needed to start one

6  to do consulting.

7      Q.    And you don't know -- where is it

8  registered?  Is it registered in Ohio?

9      A.    Yes, sir.

10     Q.    Okay.  You don't know the -- sitting

11 here, you don't know the name of it?

12     A.    I don't.

13     Q.    You set that up in January of 2020?

14     A.    Somewhere around that time.

15     Q.    Was there anybody else associated with

16 that LLC?

17     A.    No.

18     Q.    Okay.  That LLC has never operated?

19     A.    Correct.

20     Q.    Okay.  And it's never generated any

21 income?

22     A.    No.

23     Q.    Okay.  Nobody's taken a salary?

24     A.    No, no income, no bank account, nothing.

25                (Telephone interruption.)

Shannon Burns

```
 1            MR. MURPHY:  Glenn, was that your
 2   ringer?
 3            MR. FORBES:  It was, and I'm turning it
 4   off.  Go ahead.  It was spam anyway.
 5            MR. MURPHY:  Sticking with your Scottish
 6   roots here.
 7            MR. FORBES:  Yes, and my undergrad at
 8   Wooster.
 9            MR. MURPHY:  Fair enough.
10   BY MR. MURPHY:
11      Q.    All right.  So do you have employment
12   outside of Victory Solutions at this time?
13      A.    No.
14      Q.    You're not paid by anybody else?
15      A.    No.
16      Q.    Are you working for any campaigns in any
17   capacity?
18      A.    No.
19      Q.    Okay.  Are you working at all for the
20   Trump 2020 Campaign right now?
21      A.    No.
22      Q.    Okay.  Have you worked for the Trump
23   2020 Campaign at any time during 2019 or 2020?
24      A.    No, I've never worked for them.
25      Q.    Are you a contractor for the --
```

Shannon Burns

1    A.    No.

2    Q.    -- Trump 2020 Campaign?

3          Have you received any money from the

4    2020 Campaign that would be reported to the FEC?

5    A.    That would be reimbursed for expenses

6    from them.

7    Q.    So just expenses, there's no salary, no

8    per diem, nothing on top of actual hard expenses?

9    A.    There may be some per diems as well, but

10   expenses and per diems, no, that would be it.

11   Q.    Is that under -- do you have a signed

12   contract with them?

13   A.    No, I was just volunteering for the

14   campaign.

15   Q.    So not in any sort of hired, employed or

16   independent contractor capacity?

17   A.    That's correct.

18                      -   -   -   -   -

19   (Thereupon, Plaintiff's Deposition Exhibit 3,

20   printouts from the Victory Solutions website, was

21   marked for purposes of identification.)

22                      -   -   -   -   -

23   Q.    All right.  If I could get you to turn

24   to what will be Exhibit 3, which is some

25   printouts from the Victory Solutions website.  I

Shannon Burns

```
 1    want to talk about the goods and services that
 2    Victory Solutions provides.  Looks like on page
 3    15 of the binder in Tab 3 it says, "Our Product
 4    Suite."
 5              That's what you refer to as the services
 6    that you provide?
 7        A.    Yes.
 8        Q.    Okay.  And one of those is Victory VoIP?
 9        A.    Yes.
10        Q.    Is that right?
11              Is that correct?
12        A.    Yes.
13        Q.    One thing is we will need audible
14    answers because we have a written record.
15        A.    I did.  I think I just talked over you.
16        Q.    Okay.  What is Victory VoIP exactly?
17        A.    It is a VoIP phone system that we rent
18    to campaigns.
19        Q.    Okay.  And then the next one on page 17
20    here it says, "Live Calls."
21              What's entailed in live calls?
22        A.    I'm sorry, hold on for a moment, please.
23              (Whereupon, the witness muted his
24    microphone.)
25              I apologize.  We have a bit of a family
```

Shannon Burns

1    emergency today, so I am with my girls as well so

2    we may have a couple of interruptions.

3        Q.    I apologize.  I have homebound kids as

4    well.  I snuck out to the office to do today.

5        A.    I apologize, I don't recall your

6    question.  You can reask that now.

7        Q.    Oh, we were talking about live calls.

8    That's another service that Victory Solutions

9    provides?

10       A.    Yes.

11       Q.    Okay.  And they still currently provide

12   that?

13       A.    Yes.

14       Q.    Okay.  And then Victory Town Hall, what

15   is Victory Town Hall?

16       A.    It is an automated calling product that

17   calls multiple voters and hosts a live conference

18   call with those voters.

19       Q.    And then the last one on this, on page

20   19, is Victory Cloud.  What is Victory Cloud?

21       A.    It's an automated calling platform where

22   we send automated messages out to voters.

23       Q.    Now, automated messages, is that voice

24   messages?

25       A.    Yes.

Shannon Burns

1    Q.    Okay.  That's distinct from text

2  messages?

3    A.    That's correct.

4    Q.    Okay.  Now, do you have any other

5  offerings through Victory Solutions?

6    A.    We do offer text messaging, peer-to-peer

7  texts going out to voters.  And we also offer

8  improvement to data files.  It lists improvement

9  services.

10        MR. MURPHY:  Nancy, is his mic cutting

11  out on you?

12        THE REPORTER:  No.

13        MR. MURPHY:  Are you able to catch that?

14        THE REPORTER:  Yes, I'm getting it.

15        MR. MURPHY:  Okay.

16  BY MR. MURPHY:

17    Q.    Okay.  So first one you talked about,

18  peer-to-peer texts, is that something called

19  Victory Text?

20    A.    Yes.

21    Q.    When did you start offering that?

22    A.    Sometime in 2019.  I don't know exactly

23  when.

24    Q.    Okay.  What type of equipment is

25  involved in Victory Texts?  Are there servers?

Shannon Burns

1   How does it work?

2      A.     There's no equipment involved.  We

3   wholesale a product.

4      Q.     Okay.  And who do you wholesale it

5   through?

6      A.     Excuse me?

7      Q.     I mean, how does it work?  What do you

8   sell exactly?

9      A.     It's a web-based peer-to-peer texting

10  platform that we white label and sell as Victory

11  Text, so the product is all web based, software

12  to service.

13     Q.     Who do you license it from?

14     A.     The company is Point Blank Political.

15     Q.     And by white labeling it, you just mean

16  you put Victory Text on it?

17     A.     Correct.

18     Q.     On the interface or whatever?

19     A.     Correct.

20     Q.     Okay.  You said that was Point Blank

21  Political Solutions?

22     A.     Point Blank Political.

23     Q.     Okay.  Where are they located?

24     A.     In Florida.

25     Q.     Florida.  Who do you deal with at Point

Shannon Burns

1    Blank Political?

2      A.    My contact is Hunter Lamirande.  I don't

3    think I could produce his -- spell his name.

4    It's French.

5      Q.    That's fine.  We can find it.

6            Now, you talked about improvement to

7    data file.  What is that?  What type of work is

8    that?

9      A.    Campaign would have a voter file and

10   they need new phone numbers appended to it or

11   other data appended to it.  And we broker various

12   vendors that provide that and then help improve

13   that data file for the campaign.

14     Q.    So talking about brokers, is that the

15   same or different than a reseller?

16     A.    A reseller sells for us.  If we broker,

17   we are brokering from a vendor that we're buying

18   from.

19     Q.    Okay.  So you said a reseller sells for

20   you.  Sells for Victory Solutions to various

21   political campaigns or entities or whatever,

22   nonprofits, whatever type of organization that

23   uses one of your suite of products?

24     A.    Yes.

25     Q.    Okay.  And the main point of contact at

Shannon Burns

```
 1   Victory Solutions for those resellers?
 2       A.    Would be me.
 3       Q.    Okay.  Is there anybody else that deals
 4   with them directly?
 5       A.    No.
 6       Q.    Okay.  And you develop all those
 7   relationships personally?
 8       A.    Yes.
 9       Q.    Okay.  So you would know all those
10   people?
11       A.    Yes.
12       Q.    Do you have written agreements with
13   those resellers?
14       A.    No.
15       Q.    Tell me about how the reseller
16   relationship works.
17       A.    We establish a price for our products
18   that we sell to our resellers.  They buy the
19   product from us and then sell to campaigns at
20   whatever price the value of their service is.
21       Q.    So what documentation would you have
22   that will -- not to confuse things, so one we'll
23   talk about later is Kania Enterprises.
24             Is that one that you do work with?
25       A.    I'm familiar with Kania Enterprises, but
```

Shannon Burns

```
 1    we do not do business with Kania Enterprises.
 2        Q.    Okay.  Have you ever done business with
 3    Kania Enterprises?
 4        A.    I don't recall.
 5        Q.    Okay.  How would you find out if you
 6    did?  Where would you look?
 7        A.    I don't know.  I mean, I think that what
 8    you're getting at is that Kania Enterprises has a
 9    sister company called Direct Tech Solutions, and
10    that's who we do business with.  I don't know if
11    we've ever done any business with Kania
12    Enterprises.
13        Q.    Okay.  And, you know, again, just strike
14    Kania as a -- just call it ACME Political
15    Strategies, right, just a generic name.
16              Where would you go in your records to
17    find out the list of resellers that you're either
18    currently doing business with or have done
19    business with in the last two years?
20        A.    I would go to QuickBooks.
21        Q.    QuickBooks.  Okay.  Who operates your
22    QuickBooks?
23        A.    I do.
24        Q.    Anybody else?
25        A.    No.
```

Shannon Burns

```
 1      Q.     Okay.  Now, you recall there was a woman
 2   named Shannon Anderson -- or no, Melissa
 3   Anderson.
 4          Does she still work with you?
 5      A.     No.
 6      Q.     She was doing accounting, I think?
 7      A.     No.
 8      Q.     Okay.  So QuickBooks is something that
 9   you're facile with, you can operate and find the
10   names of people who you're doing business with or
11   owe you money or accounts receivable or accounts
12   payable, whatever?
13      A.     Yes.
14      Q.     Okay.  Now, when you -- you said you
15   provide a price.
16          Do you provide a written estimate to
17   them on some sort of written offer that they can
18   accept or reject?
19      A.     No.
20      Q.     Okay.  So how do you -- you said Direct
21   Tech Enterprises.  How does Direct Tech know what
22   its price structure is?
23      A.     We have a standard price sheet that they
24   go off have to build out a -- so they know what
25   they would be charged for a contract with the
```

Shannon Burns

1    customer, they go out and secure business and buy

2    from us at the price structure that we've

3    established.

4        Q.    So that's just a standard price

5    structure, kind of take it or leave it?

6        A.    Correct.

7        Q.    Is it modified for anybody?

8        A.    As a rule, no.  There have been

9    exceptions, but as a rule, it doesn't get

10   modified.

11                    -   -   -   -   -

12   (Thereupon, Plaintiff's Deposition Exhibit 4,

13   notice of location of property equipment, was

14   marked for purposes of identification.)

15                    -   -   -   -   -

16       Q.    Okay.  I'd like to ask you about -- if I

17   can get you to turn to Exhibit 4.  And this is a

18   notice of location of property equipment.  I want

19   to talk to you about the table on page 42 of the

20   binder.

21       A.    Okay.

22       Q.    I want to talk about those list of

23   columns there.  System number, there's a VV

24   number.  What is that VV number?

25       A.    That would be the designation for the

Shannon Burns

1    Victory VoIP system that is listed.

2       Q.    Okay.  So each system has a unique

3    identifier in your inventory?

4       A.    Correct.

5       Q.    When you send phones out to a campaign,

6    say how do you track which ones were sent?  What

7    type of computers?  Is it computer tracking?  Is

8    that kept on paper?

9       A.    We track that through a web-based system

10   that we build ourself.  We refer to it as the

11   E-Site.

12      Q.    E-Site?

13      A.    Yes.

14      Q.    That has a reporting function?

15      A.    On-screen reporting, there's no -- yes,

16   on-screen reporting.

17      Q.    Okay.  But you can't print from there or

18   export?

19      A.    Never tried.

20      Q.    You've never tried to print from your

21   proprietary website that you track inventory

22   from?

23      A.    No, sir.

24      Q.    How did you run this report then?  How

25   did you get the automation for this?

Shannon Burns

1    A.    I hand typed those in.

2    Q.    All right.  What is an HQ?

3    A.    It's an abbreviation for a headquarters

4    unit.

5    Q.    Is that like a server?

6    A.    Yes, server.  Server case, yes.

7    Q.    What's a CE?

8    A.    It's an abbreviation for a candidate

9    edition unit.

10   Q.    What is that exactly?

11   A.    It is what we refer to as a small Linux

12   appliance that's on the back of a phone.

13   Q.    Total phones, what other -- do you

14   capture information in your E-Site on these

15   fields?

16         Like, is there a campaign name?  Is it

17   linked to a reseller?  What other information do

18   you capture in your E-Site?

19   A.    It would be linked to a reseller.

20   Q.    Okay.  So on the top line here, VV0051,

21   you would know if you looked at the E-Site site

22   who the reseller was.

23         Would you know who the contact

24   information is for that E-seller?

25   A.    We don't have contact information in

Shannon Burns

1   there, no.

2       Q.      Okay.  So what other fields do you have

3   in the E-Site that you can think of?

4       A.      It just identifies which reseller and

5   campaign name that system is assigned to.

6       Q.      Okay.  Anything beyond those two fields?

7       A.      I don't believe so.

8       Q.      Doesn't have contact information for the

9   reseller, doesn't have contact information for

10  the campaign?

11      A.      It's possible that sometimes it does,

12  but it's not consistent.  So that information is

13  what we input into the system.  Sometimes the

14  reseller will input other information as well.

15      Q.      Would you conduct a search to find out

16  where all your equipment is currently deployed?

17          What would be involved in that?

18      A.      It would be to reach out to each of the

19  resellers to identify where the equipment is.

20      Q.      Well, isn't that -- campaign state

21  doesn't capture that?  You couldn't go in and say

22  campaign state right now and print out or look at

23  a list of where you have phones in HQs and CEs?

24      A.      Every order that goes out we know where

25  we shipped it to, but that doesn't mean that's

Shannon Burns

1   where it is.  We'll regularly ship to a reseller

2   and then they'll take it to the campaign, so.

3       Q.    Okay.

4       A.    So we'll know where we ship to.

5       Q.    So Campaign Street is not the campaign

6   or that's the reseller?

7       A.    That would be the last known address

8   that we had for where it was sent to.  So labeled

9   as campaign maybe also reseller, it just depends

10  on the specific circumstance.  So it may have

11  been a campaign or it may have been a reseller.

12      Q.    Okay.  How do you get the direction from

13  your reseller where to send it?  How is that

14  communication made?

15      A.    They send us an order form that has the

16  shipping address on it.

17      Q.    Okay.  How do you keep those order

18  forms?

19      A.    On my computer.

20      Q.    Okay.  So they're stand in, there's

21  electronic copies of those?

22      A.    Yes.

23      Q.    Are those readily accessible?

24      A.    Yes.

25      Q.    You know where they are specifically,

Shannon Burns

1    you could go right to them, open up your computer

2    right now, for instance?

3        A.    Yes.

4        Q.    Okay.  How do you name the files?  Do

5    you have a certain naming system that you use to

6    identify those?

7        A.    No, there's not really a specific naming

8    structure.

9        Q.    Okay.  But you could sort them by date,

10   for example?

11       A.    No, we store them by reseller, so I

12   couldn't really sort them by anything.

13       Q.    Okay.  About how many resellers are you

14   currently doing business with?

15       A.    Off the top of my head, I don't know the

16   answer to that.

17       Q.    More than 10?

18       A.    I'm sorry, ask that again, please.

19       Q.    How many resellers are you currently

20   doing business with?

21       A.    I said I don't know exactly how many.

22       Q.    More than 10?

23       A.    Yes.

24       Q.    Okay.  More than 20 do you think?

25       A.    I doubt it.

Shannon Burns

```
1      Q.     I'd like to go back to page 5 and look
2   at it on the screen here.  One of the topics,
3   topic 4 was current location of any Victory
4   Solutions property outside of Ohio and the person
5   who or entity that is in possession of the
6   property, including the name of the principal
7   contact of the entity, person's job title, and
8   contact information.
9          Now, sitting here right now, are you
10  able to tell me that Victory Solutions has
11  shipped phones or any other equipment outside the
12  State of Ohio either through a reseller or
13  directly to a campaign?
14     A.     Sitting here now, I couldn't recount
15  that to you.
16     Q.     Okay.  And you didn't do anything to
17  prepare for this particular topic in advance of
18  your deposition?
19     A.     No, I didn't.
20     Q.     Okay.  You didn't look at your E-Site or
21  do any sort of searches to determine which
22  resellers had property outside of Ohio at this
23  precise moment?
24     A.     No, I didn't.
25     Q.     Okay.  Is there a reason you didn't do
```

Shannon Burns

1   that?

2      A.    I am a one-man show and have a lot of

3   family issues happening right now and honestly

4   don't even have time to operate my company.

5      Q.    Okay.  And I understand that.  I have a

6   client who you owe several hundred thousands

7   dollars to and I'm trying to collect that for

8   him, you know.  I did provide a draft copy of

9   these topics probably six weeks, almost two

10  months ago at this point, but we can take that up

11  at a later date.

12         But can you name a single reseller

13  outside of the State of Ohio where you currently

14  sent phones or servers or HQ or CEs to as we sit

15  here today?

16     A.    Sure.  I know that we sent systems to

17  Fitzsimmons Consulting Communications out of New

18  Jersey.

19     Q.    Fitzsimmons is in New Jersey.  Who is

20  the contact there?

21     A.    Tom Fitzsimmons.

22     Q.    Okay.  Now, is that for a campaign or is

23  that for something else?

24     A.    I honestly don't remember.

25     Q.    Okay.  But if you look at your E-Site

Shannon Burns

```
 1    now, you could go under the reseller for
 2    Fitzsimmons and determine precisely which units
 3    he directed you to send or caused you to send?
 4    A.    Yes.
 5    Q.    You would know where you sent that to,
 6    the address?
 7    A.    With some research, we could determine
 8    that.
 9    Q.    Okay.  Research beyond the E-Site,
10    what's available in the E-Site?
11    A.    Yes.
12    Q.    Okay.  What would you -- beyond what's
13    on the E-Site, what would you research?
14    A.    The order form that he would have sent
15    in for those orders.
16    Q.    Okay.  Now, from the order form, is that
17    stuff inputted into the E-Site?
18    A.    Yes.
19    Q.    Is there stuff -- is there information
20    on the order form that's not on the E-Site?
21    A.    Yes.
22    Q.    What information is on the --
23    A.    Shipping address and things that we
24    talked about before.
25    Q.    That's on the order form, but not on the
```

Shannon Burns

```
1    E-Site?

2      A.     Correct.

3      Q.     Okay.  Beyond Fitzsimmons, can you think

4    of any others?

5             We talked about one was Direct Tech

6    Enterprises; is that correct?

7      A.     Correct.  That is right, Direct Tech

8    does have one system.

9      Q.     Do you know who they got that -- who

10   Direct Tech ordered for specifically?  Do you

11   know who that is?

12     A.     I think you know what that is.

13   Allegheny Republican Party.

14     Q.     The Republican Committee of Allegheny

15   County?

16     A.     Yeah, sounds good.

17     Q.     Okay.  Now, that was for Direct Tech?

18     A.     Correct.

19     Q.     Okay.  And Mr. Kania is associated with

20   Direct Tech?

21     A.     Yes.

22     Q.     Okay.  That's a subsidiary of Kania

23   Enterprises or some relation to Kania

24   Enterprises?

25     A.     I don't know what the relationship would
```

Shannon Burns

```
1    be if there is one.

2       Q.    Okay.  When is the last time you spoke

3    to Mr. Kania?

4       A.    I don't recall when the last time I

5    spoke to him was.

6       Q.    In the last two weeks?

7       A.    I'm not sure I have in the last two

8    weeks.

9       Q.    In the last 30 days?

10      A.    Yes.  I think within the last month,

11   yes.

12      Q.    Okay.  What did Mr. Kania tell you?

13      A.    I don't recall what the conversation

14   would have been about.

15      Q.    You don't recall anything that you

16   discussed?

17      A.    I do remember one conversation.  He said

18   that he had hired a new employee to help him

19   support things.

20      Q.    Now, you made a reference to me earlier.

21   You said I think you know who that is.

22            Did you discuss a letter that I had sent

23   to Mr. Kania?

24      A.    I'm sorry, repeat the question.

25      Q.    Did you discuss a letter that I had sent
```

Shannon Burns

1    to Mr. Kania?

2       A.    With whom?

3       Q.    With Mr. Kania?

4       A.    Yes.  Yes, I did.

5       Q.    Okay.  So that's in addition to the one

6    employee he hired, you talked about the letter I

7    sent him on July 27th?

8       A.    Yes, I did have.  I don't remember when

9    it was, but I did have a conversation with him

10   about that.

11      Q.    Okay.  Do you recall what you guys

12   discussed?

13      A.    I think I discussed that he was going to

14   be seeing a letter coming in from him.  And I got

15   a copy of it to him so he knew about it ahead of

16   time.

17      Q.    Okay.  How did you get a copy to him?

18   Did you e-mail him or fax him?

19      A.    I'm fairly certain I e-mailed it to him.

20      Q.    Okay.  You e-mailed him, but you also

21   spoke with him on the telephone?

22      A.    Correct.

23      Q.    And have you spoken to him in person?

24      A.    Repeat that again.

25      Q.    Face to face.

Shannon Burns

1    A.    When?

2    Q.    Since July 27th, when I sent the letter?

3    A.    I have not -- I don't remember ever

4  seeing him in person since you sent that letter.

5    Q.    Okay.  Have you spoken to a gentleman

6  named Sam DeMarco since July 27th?

7    A.    I don't think I know who Sam DeMarco is.

8    Q.    Okay.  If I said he was the Republican

9  Committee of Allegheny.  He's the chair of that.

10  Does that refresh your recollection?

11    A.    Oh, I think I did meet him when I was in

12  their office.

13    Q.    When were you in their office?

14    A.    It was sometime in July.  I don't recall

15  what the date was.

16    Q.    Okay.  Do you know how many phones you

17  have presently at RCAC?

18    A.    Not off the top of my head.

19    Q.    More than 10?

20    A.    Yes, I believe there's more than 10.

21    Q.    Now, one of the identifying factors of

22  Victory Solutions' phone, as I understand it,

23  correct me if I'm wrong, is that there's a red

24  cord; is that correct?

25    A.    Yes.

Shannon Burns

```
1       Q.      Between the communicator and the

2    receiver.  So are you aware of any other

3    companies that use a red cord?

4       A.      No.

5       Q.      Okay.  So if a picture appeared on

6    Facebook of somebody phone banking the red cord,

7    that would be some indicia that that's a Victory

8    Solutions unit?

9       A.      I think that would be accurate.

10      Q.      Okay.  That would be a fair assumption

11   that it would be a Victory Solutions phone?

12      A.      Yes.

13      Q.      All right.  Other than that -- so your

14   reseller there is Direct Tech.

15              Do you have any other current contracts

16   with Direct Tech at this time?

17      A.      I don't believe so.

18      Q.      Okay.  How could you confirm that,

19   through the E-Site or the order forms?

20      A.      Yes.

21      Q.      Okay.  Any others you can think of as we

22   sit here, other than Fitzsimmons and Direct Tech?

23      A.      Off the top of my head, I can't think of

24   any others right now.

25      Q.      Okay.  But, again, all that information
```

Shannon Burns

```
 1    would be readily accessible through the order

 2    forms through the E-Site?

 3        A.    Yes.

 4                            -  -  -  -  -

 5    (Thereupon, Plaintiff's Deposition Exhibit 6,

 6    Garnishee list of names, was marked for purposes of

 7    identification.)

 8                            -  -  -  -  -

 9        Q.    Okay.  I'm going to go to Exhibit 6

10    here.  And this is in tab 6 of the binder.  I'm

11    going to go through some names, see if I can jog

12    your memory here.

13              So one is Axiom Strategies.  Are you

14    currently doing any business with Axiom

15    Strategies that you can recall?

16        A.    No.

17        Q.    No, you don't recall; or no, you're not

18    doing business with them?

19        A.    I don't believe we're doing any business

20    with them.

21        Q.    Okay.  But again, you can confirm that

22    through the order forms on the E-Site?

23        A.    Yes.

24        Q.    And that would be easy to do?

25        A.    Fairly easy.
```

Shannon Burns

1    Q.    Okay.  Approximately how much time would

2  it involve right now, let's say, to confirm

3  whether you're doing business with Axiom

4  Strategies?

5    A.    Within a day's worth of work or so.

6    Q.    A day?

7    A.    Less than a day's worth of work, sure.

8    Q.    I mean, you have these stored into a

9  computer filing system, right?

10    A.    Yes.

11    Q.    Do you access -- are they in a

12  specific --

13          (Interruption.)

14          (Whereupon, the witness muted his

15  microphone.)

16    A.    Sorry about that.

17    Q.    So we're trying to figure out -- so if

18  you were to sit down right now and determine

19  whether or not you had any phones that were

20  shipped to your reseller, through your reseller,

21  Axiom Strategies, trying to figure out if it

22  would take you more than 30 minutes to do it?

23    A.    It is possible, yes.

24    Q.    That it would take more than 30 minutes?

25    A.    Yes.  If the E-Site isn't complete, I'd

Shannon Burns

1    have to do research to determine where systems
2    are, so yes, I think that it's realistic that it
3    would take longer.
4        Q.    Okay.  So there are two places we said,
5    order forms or the E-Site?
6        A.    Right.  Yes.
7        Q.    How would you go about to find out
8    whether Axiom had a current order that you
9    fulfilled that's still in the field?
10       A.    Well, I would look for evidence of an
11   order form coming in.  I would look on the E-Site
12   to see if I have accurately documented it and
13   then compare those two with E-Site to see if I
14   have exhausted that -- I mean, obviously I want
15   to make sure I've exhausted the possibility that
16   we sent a system to them.
17       Q.    Okay.  So do you keep a certain sub
18   folder through Windows, you know, Windows' folder
19   for each reseller, so would there be a folder
20   called Axiom?
21       A.    Yes.
22       Q.    Then you would look for -- if you can
23   recall, who is the contact at Axiom?
24       A.    I don't know who the contact would be
25   there anymore.

Shannon Burns

1      Q.     Okay.  But you would presumably have

2   some sort of e-mail or some attachment that would

3   have that information?

4      A.     Yes.

5      Q.     Okay.  Now, who at Victory Solutions is

6   helping you fulfill these shipments?

7      A.     Just me.

8      Q.     Just you.  Okay.  So you ship everything

9   out?

10     A.     Yes.

11     Q.     Okay.  Do you have anybody else helping?

12     A.     No.

13     Q.     Okay.  How long has that been the case?

14     A.     Has what been the case?

15     Q.     That you've been the only person

16  shipping stuff out?

17     A.     It's been almost all of 2020.

18     Q.     Okay.  So you would have firsthand

19  knowledge of everything that's gone out in at

20  least 2020, correct?

21     A.     Correct.

22     Q.     Okay.  So other than Fitzsimmons and

23  Direct Tech, who can you recall sending equipment

24  to during 2020?

25     A.     I've done so little, I just don't

Shannon Burns

1    remember the other ones.

2        Q.    Okay.  So you've done very few, but you

3    don't remember; is that your testimony?

4        A.    Yes.

5        Q.    Okay.  But if you've done very few, then

6    you would be able in relatively quick fashion to

7    find out where those have been shipped, right?

8              Do you have a UPS account that you have

9    automated or do you go through Fed Ex?

10       A.    Yes, we have an UPS.

11       Q.    So you could print out a UPS report say

12   at least to know where you shipped stuff.

13             Is that something that would be readily

14   accessible to you?

15       A.    Yes, I'm certain that UPS has some sort

16   of a report for that, absolutely.

17       Q.    Okay.  And that's something then you run

18   those UPS reports in your facile with software?

19       A.    I've never done it before.

20       Q.    Okay.  But do you generate the shipping

21   labels personally?

22       A.    Yes.

23       Q.    Okay.  And then do you send some sort of

24   -- do you send an invoice to the reseller or how

25   does that work?

Shannon Burns

1    A.     Yes.

2    Q.     Okay.  So you would have a record of the

3    invoices, too, that you've sent in 2020?

4    A.     Yes.

5    Q.     Where do you keep those invoices?

6    A.     In QuickBooks.

7    Q.     QuickBooks.  Okay.  Now, does the

8    QuickBooks, is there any overlap between the

9    information in QuickBooks and the E-Site?

10   A.     I mean, the name of the reseller is in

11   both.

12   Q.     Okay.  Anything else?

13   A.     Sometimes the system number makes it

14   into the QuickBooks.

15   Q.     Okay.

16   A.     Not consistently.

17   Q.     Not consistently.

18          Okay.  Is there typically a name in

19   QuickBooks as the person you're directing the

20   invoice?

21   A.     I just -- I'm not sure.  Honestly, I'm

22   not sure whether there's typically a name.  I

23   mean, the company is always on there and, of

24   course, the e-mail address that it gets sent out

25   to.

Shannon Burns

1     Q.     But sitting here today for 2020, you

2   can't think of any others that you've sent

3   equipment to, other than Fitzsimmons and Direct

4   Tech?

5     A.     Sorry, right now I can't.

6     Q.     Okay.  On this list here of people we

7   sent garnishments to before, how about Candidate

8   Command, does that ring a bell?

9     A.     Yes.

10    Q.     Any current business with Candidate

11  Command?

12    A.     Not that I recall.

13    Q.     Okay.  Chariot Research?

14    A.     Not that I recall.

15    Q.     Cloud Strategies?

16    A.     Not that I recall.

17    Q.     Cygnal?

18    A.     Not that I recall.

19    Q.     Okay.  So there's one that we talked

20  about, Direct Tech Solutions, highlighted?

21    A.     Right.

22    Q.     That's the one with associated with Rob

23  Kania, K-A-N-I-A?

24    A.     Correct.

25    Q.     How about Grass Roots Partners?

Shannon Burns

```
1    A.    Not that I recall.

2    Q.    GSG Strategies?

3    A.    Who is it?  I'm sorry.

4    Q.    GSG Strategies?

5    A.    Not that I recall.

6    Q.    Hallowell Consulting?

7    A.    No.

8    Q.    Littlefield Communications?

9    A.    Who is it, I'm sorry.

10   Q.    Littlefield Communications?

11   A.    No, not that I recall.

12   Q.    Maine Republican Party?

13   A.    Not that I recall.

14   Q.    MDS Communications?

15   A.    Who is it?

16   Q.    MDS?  It's highlighted.

17   A.    I don't recognize that name.

18   Q.    Okay.  Mine Creek Strategies?

19   A.    Not that I recall.

20   Q.    Political Media, Inc.?

21   A.    Not that I recall.

22   Q.    Revolvis?

23   A.    No, they're out of business.

24   Q.    Okay.  SOCO, S-O-C-O, Strategies, LLC?

25   A.    Not that I recall.
```

Shannon Burns

1    Q.    Okay.  Surge Red?

2    A.    The answer is no, I'm sorry.

3    Q.    I couldn't hear that.

4    A.    I said the answer was no on that.

5    They're out of business.

6    Q.    Okay.  Take Back Our Republic?

7    A.    No.

8    Q.    Okay.  The Prosper Group?

9    A.    No.

10   Q.    Strategy Group Company?

11   A.    Not that I recall, no.

12   Q.    Okay.  Twin Oak Connect?

13   A.    Not that I recall.

14   Q.    UPT Strategies?

15   A.    Not that I recall.

16   Q.    All right.  Victory Media?

17   A.    No, not that I recall.

18   Q.    What's the name of the gentleman

19   associated with Victory Media?  They're in

20   Michigan; is that right?

21   A.    No, I think -- I think Victory Media is

22   out of Illinois, I think.

23   Q.    Okay.  How about Victory Phones, is that

24   Michigan?

25   A.    Yes, they're in Michigan.

Shannon Burns

1      Q.    Okay.  Are you doing any work with them

2   presently?

3      A.    I believe we did have a small project

4   with them.  I don't recall the details of it.

5      Q.    Okay.  But you believe you have one

6   presently, but that's something you could find

7   out either through the invoices or through UPS

8   or --

9      A.    Correct.

10     Q.    -- through order forms or through the

11   E-Site?

12     A.    That's correct.

13     Q.    And if somebody had shipped something to

14   Victory Phones, it would have been you, correct?

15     A.    Yes.

16     Q.    Okay.  But sitting here today, you can't

17   recall if you presently have a project with them

18   outstanding?

19     A.    That's correct.

20     Q.    Young Republicans National Federation?

21     A.    No, I don't think I've ever done

22   business with them.

23     Q.    Okay.  I have to get you to speak up

24   just a little bit or get closer.

25     A.    I said no, I don't recall that, no.

Shannon Burns

1      Q.     Okay.  Again, make sure I'm on the right

2   Exhibit here.  We're on Exhibit 6.  We're on page

3   58 of the binder.  There is -- here we go,

4   Ascendant Public Policy Group, LLC?

5      A.     We may have one system with Ascendant.

6      Q.     Are they located in Ohio?

7      A.     Yes, they are.

8      Q.     Okay.  Do you know where that system

9   would have been sent to, inside Ohio or outside

10  of Ohio?

11     A.     I think it was sent to some place in

12  California.

13     Q.     California.  Okay.  Would that be the

14  California Republican Party?

15     A.     No, we're not going business with them.

16     Q.     I'm sorry?

17     A.     Thanks for that by the way.

18     Q.     I'm sorry, I missed what you said.

19     A.     I said no.  No, not for California

20  Republican Party.

21     Q.     Okay.  How about Campaign Now, LLC?

22     A.     No.

23     Q.     How about Murphy Nasica?

24     A.     No.

25     Q.     How about Ascendant Communications?

Shannon Burns

```
 1     A.     I'm pretty sure you already asked me
 2   that.
 3     Q.     Well, I asked you about the Ascendant
 4   Public Policy Group, I think.
 5     A.     I'm not familiar with Ascendant
 6   Communications.
 7     Q.     Okay.  I think they're related, but a
 8   different entity or DBA or something.
 9            How about the Aventine Group?
10     A.     The Aventine Group?  I'm not familiar
11   with that.
12     Q.     Okay.  Cloudage Strategies or Cloudage?
13     A.     No, not that I recall.
14     Q.     Okay.  Fitzsimmons Communications,
15   that's one we talked about in New Jersey,
16   correct?
17     A.     Correct.
18     Q.     Okay.  And you said that was -- did you
19   say that was Bob Fitzsimmons?
20     A.     No, I didn't.
21     Q.     What is Fitzsimmons' name?
22     A.     Excuse me?
23     Q.     What is Mr. Fitzsommons' first name?
24     A.     Tom.
25     Q.     Tom.  Okay.  Gilliard Blanning (Polling
```

Shannon Burns

```
 1    America), does that ring a bell?
 2        A.    It does ring a bell.
 3        Q.    Is that somebody you're currently doing
 4    business with?
 5        A.    Not that I recall.
 6        Q.    Okay.  But again, if you were, that
 7    would be -- you could find that on the sources we
 8    discussed, correct?
 9        A.    Yes.
10              MR. MURPHY:  Nancy, do you need a break?
11    I have a couple more, but do you need a break
12    after this?
13              THE REPORTER:  No, thank you.  I'm fine.
14        Q.    ICS Consulting, Inc.?
15        A.    It is possible we might have one still
16    with ICS.  I'm not sure.
17        Q.    Where is ICS located?
18        A.    Atlanta.
19        Q.    Who is your point of contact at ICS?
20        A.    John Parker.
21        Q.    Olson Strategies & Advertising?
22        A.    Not that I recall.
23        Q.    People Who Think, LLC?
24        A.    Not that I recall.
25        Q.    Potomac Strategy Group?
```

Shannon Burns

```
 1      A.    Not that I recall.

 2      Q.    The Prosper Group Corporation?

 3      A.    You already asked me that.

 4      Q.    Oh, did I?  I'm sorry.  And the answer

 5   was you don't recall?

 6      A.    Correct.

 7      Q.    Yep.  I apologize.  REACH

 8   Communications?

 9      A.    I don't recognize that name.

10                   -  -  -  -  -

11   (Thereupon, Plaintiff's Deposition Exhibit 9,

12   Bankruptcy Form 202 for Victory Solutions, LLC,

13   dated March 12, 2018, was marked for purposes of

14   identification.)

15                   -  -  -  -  -

16      Q.    Okay.  I'm going to show you something

17   in Exhibit 8 -- I'm sorry, Exhibit 9.  It's page

18   -- let me ask this:  Does Victory Solutions

19   presently maintain a bank account?

20      A.    I'm sorry, you trailed off.  I couldn't

21   hear you.

22      Q.    Does Victory Solutions currently

23   maintain one or more bank accounts?

24      A.    Yes.

25      Q.    And what institutions does Victory
```

Shannon Burns

```
 1    Solutions use?

 2    A.    First National Bank of PA.

 3    Q.    Any others?

 4    A.    No.

 5    Q.    Okay.  So this is something that was

 6    filed in one of your bankruptcy matters.  Again,

 7    this is -- we've marked as Exhibit 9, this is

 8    filed on March 12, 2018.  At that time --

 9              (telephone interruption.)

10    Q.    This is topic number 17 definitely here.

11    But it says you used First National Bank and then

12    J.P. Morgan Chase.

13              Do you know if this is the same account

14    you use now -- did you use the same account then

15    as you're using now?

16    A.    I'm not familiar with which filing this

17    is, so I couldn't tell you.

18    Q.    Have you reestablished a bank account

19    for Victory Solutions in the last two years?

20    A.    In the last what?  I'm sorry.

21    Q.    Two years.  This is filed March 12,

22    2018.  Have you closed and reopened an account

23    since then?

24    A.    I just don't recall.  There was movement

25    that had to happen because of the bankruptcy that
```

Shannon Burns

```
 1    they had specific accounts need to be open.  I
 2    don't remember what dates those were.
 3       Q.    Did you provide wiring instructions to
 4    your resellers about where to wire money to what
 5    account?
 6       A.    Yes.
 7       Q.    Okay.  And do you have that on a printed
 8    form or some sort of standardized sheet of paper
 9    that you send them to?
10       A.    I don't think we have like a
11    standardized form, no.
12       Q.    How do you convey what your account and
13    wiring instructions are to your reseller?
14       A.    We just send an e-mail.
15       Q.    So you would have those account numbers
16    in an e-mail?
17       A.    Yes.
18       Q.    And you could access those account
19    numbers in a readily available fashion?
20       A.    Yes.
21       Q.    Okay.  So I want to look at 109 -- let
22    me ask this to close this out.  So J.P. Morgan
23    Chase, you're not presently using J.P. Morgan
24    Chase in any fashion at all for Victory Solutions
25    work?
```

Shannon Burns

1    A.    Correct.

2    Q.    So since -- well, here.  So topic 17

3    says, "Since January 1, 2020, any accounts where

4    funds for goods or services provided by Victory

5    Solutions are deposited, whether the account in

6    in the name --" sorry, typo there "-- is in the

7    name of Victory Solutions, Shannon Burns, or any

8    other employees, agents, or relatives thereof,

9    including the name and branch of the bank, credit

10   union, or other financial institution, the name

11   or names listed on the account, the account

12   numbers, and routing numbers."

13        So as you sit here today, you couldn't

14   give me that information; is that correct?

15   A.    I don't have them memorized, no.

16   Q.    Okay.  But that's something you have

17   readily access to you through your wiring

18   instructions or through a checkbook or through

19   something?

20   A.    Yes.

21   Q.    Okay.  Where is your -- you said it was

22   First National Bank of Pennsylvania.  What branch

23   do you primarily use?

24   A.    Strongsville, Ohio.

25   Q.    Strongsville, Ohio.  Okay.  Do you know

Shannon Burns

1   the address?

2       A.     Not off the top of my head.

3       Q.     Okay.  Do you know the street name?

4       A.     Pearl Road.

5       Q.     What was it?

6       A.     Pearl Road.

7       Q.     Pearl like in an oyster?

8       A.     Like what?  I'm sorry.

9       Q.     Pearl like in an oyster?

10      A.     Yes.

11      Q.     I can't hear you.

12      A.     Yes.

13      Q.     You tail off.  I think it's the

14  technology.

15             Do you have a contact at that bank?

16      A.     No, not really.

17      Q.     Okay.  So for any work that Victory

18  Solutions has done, do your wiring instructions,

19  do they say Victory Solutions or do they say

20  Shannon Burns or how do you present the wiring

21  instructions?

22      A.     Victory Solutions.

23      Q.     Okay.  So you don't -- you're not --

24  this is the only account that you use for

25  professional work that generates fees?

Shannon Burns

```
 1    A.    I already answered that question.

 2    Q.    Okay.  And that name is in the -- that

 3  account is in the name of Victory Solutions?

 4    A.    Yes.

 5    Q.    Okay.  It doesn't have your name on it

 6  individually?

 7    A.    No.

 8    Q.    Okay.  Now, for any of these phone

 9  rentals or any other -- or since 2020, this is

10  the only account where your resellers, your

11  direct contacts have wired funds to you for

12  Victory Solutions work?

13    A.    I don't recall whether I received any

14  wires in 2020.

15    Q.    You wouldn't have received a wire from

16  Direct Tech for phones that you sent to them?

17    A.    I don't recall receiving a wire.

18    Q.    Okay.

19    A.    Not that I remember at least.

20    Q.    How about would they send you a check?

21    A.    No.

22    Q.    How would -- so under what terms are you

23  -- how are you paid then from Direct Tech if it's

24  not by wire or check?

25    A.    They pay through the QuickBooks invoice.
```

Shannon Burns

1    It's either through credit card or ACH.

2        Q.    Okay.  So you accept credit cards then?

3        A.    Yes, through QuickBooks online.

4        Q.    Okay.  And then where would the ACH go?

5    Would that go to that First National account --

6        A.    Yes.

7        Q.    -- or is that another account?

8        A.    Yes.

9        Q.    Just for the record here, what's an ACH

10   payment?  What is that?

11            Do you know what ACH stands for?

12       A.    I don't.

13       Q.    Okay.  Automated clearinghouse, does

14   that ring a bell?

15       A.    If you say so.  I don't know what it

16   means.  I don't know what it stands for.

17       Q.    All right.  So how do you reclaim your

18   -- let me ask you this:  Do you have some sort of

19   corporate account or subscription with

20   QuickBooks?

21       A.    Yes.

22       Q.    I see your head nod, but is that --

23       A.    I said yes.

24       Q.    I lost sounds here on my end.

25       A.    Can you guys able to hear me?

Shannon Burns

1    Q.    Yeah, I can hear you now.

2          So do you maintain a license agreement

3    through QuickBooks, like a monthly subscription

4    or something?

5    A.    Yes.

6    Q.    Okay.  So you have an account with them

7    where certain credit card payments will go to?

8    A.    I don't know how it works.

9    Q.    Okay.  Does QuickBooks remit money back

10   to Victory Solutions on like a periodic basis?

11   A.    I don't know what you mean by that.

12   Q.    Well, you said they can pay through

13   QuickBooks online with a credit card, right?

14   A.    Correct.

15   Q.    So I mean, you can't receive a credit

16   card directly, so somebody has to handle that

17   between you and the person who submits the credit

18   card, right?

19   A.    Yes.

20   Q.    Okay.  So how do you -- if somebody pays

21   with a credit card, how does Victory Solutions

22   come into possession of that money?  Is it

23   credited automatically?  Do you receive a monthly

24   check?  How does that work?

25   A.    It just shows up in our account.  I

Shannon Burns

1    don't know how it works.

2        Q.    Okay.  But it comes -- how does it show

3    up in your account as?

4            Does it show a deposit from -- you just

5    get a deposit from QuickBooks?

6        A.    I don't remember how it shows up in my

7    account.

8        Q.    Okay.  How do you -- what do you do to

9    verify that you received all the money that's due

10   to you?

11       A.    I don't know.  I don't know what you

12   mean by that.  The amount shows up in the account

13   and then it shows up.

14       Q.    Okay.  But do you -- I mean, do you make

15   any sort of attempt at cross reference your

16   accounts receivable with what you receive?

17       A.    It goes in automatically.  I don't have

18   to do anything like that.

19       Q.    Do you have some sort of contract with

20   QuickBooks to provide these services or just an

21   online licensing agreement?

22       A.    I don't recall.

23       Q.    Okay.  Who set that up, do you remember?

24       A.    I don't remember who would have set it

25   up.  It's been years ago.

Shannon Burns

1    Q.    Okay.  How long have been using it for?

2    A.    As long as I can remember.

3    Q.    Okay.  Do you know if you're currently

4    doing any business directly through any campaigns

5    or other entities that's not through a reseller?

6    A.    Not that I'm aware of.

7    Q.    How would you confirm that?

8    A.    We don't --

9    Q.    The example I'm using, we can go to the

10   FEC report, if we need to, but there was income

11   in the last 2016 cycle for Trump for President,

12   right, that was in the name of Victory Solutions;

13   do you recall that?

14   A.    Yes.

15   Q.    Okay.  Do you have any other similar

16   arrangements presently with any campaigns or

17   committees or others that are similar?

18   A.    Not that I'm aware of.

19   Q.    In 2020, you would have been the person

20   that would have handled all of that information

21   and sent stuff and signed the contract and done

22   whatever?

23   A.    Yes.

24   Q.    Okay.  But sitting here today, you can't

25   remember any that you've done contact with

Shannon Burns

```
 1   directly?
 2      A.    Not that I recall.
 3      Q.    Again, if you were, you could confirm
 4   that through the UPS or through other records,
 5   invoices or E-Site that would remind you?
 6      A.    Yes.
 7      Q.    But that's not something you did to
 8   prepare for today?
 9      A.    Excuse me?
10      Q.    That's not something you did to prepare
11   for today's deposition?
12      A.    I don't know what you're asking me.
13   It's not what I did for what?  What do you mean?
14      Q.    You didn't go and look at any documents
15   that would refresh your recollection sitting here
16   today that would have reminded you or instructed
17   you as to who you're currently doing business
18   with directly, Victory Solutions?
19      A.    As a rule, we don't do business
20   directly, so I would have no reason to go do
21   that.
22      Q.    Okay.  But you have done directly in the
23   past under certain circumstances, right, with
24   Trump 2016?
25      A.    We did in that scenario.
```

Shannon Burns

1          MR. MURPHY:  Can we just take like a

2    10-minute break, I can organize my notes.  Given

3    where we are, I don't think I have much more, but

4    give me 10 and we'll come back.

5          THE WITNESS:  I'm fine with that.

6          MR. FORBES:  I'll get coffee.

7             (Recess taken.)

8          MR. MURPHY:  Back on the record.

9    BY MR. MURPHY:

10    Q.    The last thing I want to ask you about,

11   this is one of the reports that was filed in the

12   bankruptcy.  Where did it go?  That's why.

13          Are you guys able to see it?

14    A.    I am.

15          MR. FORBES:  I am.

16    Q.    This is on page 523, 12/31.  I want to

17   ask you, Mr. Burns, at 12/31 here, there is a

18   highlight.  At the end of the month, there is a

19   -- looks like a payment from Victory Solutions to

20   QuickBooks Intuit, for $222.48.

21          So is that part of your monthly account

22   to QuickBooks for its licensing software to you,

23   to Victory Solutions?

24    A.    I'm not really sure.  I'm not sure if

25   that would be a transaction of what you speak of.

Shannon Burns

1      Q.     You're still operating under the same

2  QuickBooks arrangements generally that you had at

3  this time when you disclosed this payment to

4  QuickBooks?

5      A.     Yes.

6      Q.     Okay.  That hasn't changed.  And then it

7  looks like QuickBooks is based in California.

8  But you're not sure, sitting here today, how if

9  somebody makes a credit card payment to

10  QuickBooks, how it makes its way back into a

11  Victory Solutions account?

12      A.     No, no idea.

13           MR. MURPHY:  All right.  I have no

14  further questions.

15           Do you have any questions, Glenn?

16           MR. FORBES:  No, I have no questions.

17           MR. MURPHY:  Okay.  Is he going to read

18  and sign?

19           MR. FORBES:  I think we'll read.

20           (Deposition concluded at 2:53 p.m.)

21                     ~  ~  ~  ~  ~

22

23

24

25

Shannon Burns

```
 1                        CERTIFICATE
     The State of Ohio,     )
 2                                    SS:
     County of Lorain.      )
 3
             I, Nancy L. Molnar, a Notary Public within
 4   and for the State of Ohio, duly commissioned and
     qualified, do hereby certify that the within named
 5   witness, SHANNON BURNS, was by me first duly sworn
     to testify the truth, the whole truth and nothing
 6   but the truth in the cause aforesaid; that the
     testimony then given by the above-referenced
 7   witness was by me reduced to stenotypy in the
     presence of said witness; afterwards transcribed,
 8   and that the foregoing is a true and correct
     transcription of the testimony so given by the
 9   above-referenced witness.
             I do further certify that this deposition
10   was taken at the time and place in the foregoing
     caption specified and was completed without
11   adjournment.
             I do further certify that I am not a
12   relative, counsel or attorney for either party, or
     otherwise interested in the event of this action.
13           IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my seal of office at Avon Lake,
14   Ohio, on this 21st day of September, 2020.
15
16                 Nancy L. Molnar
                   _____
17                 Nancy L. Molnar, Notary Public
                   Within and for the State of Ohio
18
     My commission expires July 15, 2023.
19
20
21
22
23
24
25
```

Shannon Burns

1                       -   -   -   -   -

                    E  R  R  A  T  A

2                       -   -   -   -   -

3

4      PAGE   LINE   CHANGE

5      ____   ____   _____

6         REASON:    _____

7      ____   ____   _____

8         REASON:    _____

9      ____   ____   _____

10        REASON:    _____

11     ____   ____   _____

12        REASON:    _____

13     ____   ____   _____

14        REASON:    _____

15     ____   ____   _____

16        REASON:    _____

17     ____   ____   _____

18        REASON:    _____

19     ____   ____   _____

20        REASON:    _____

21     ____   ____   _____

22        REASON:    _____

23     ____   ____   _____

24        REASON:    _____

25

Shannon Burns

1

2              ACKNOWLEDGMENT OF DEPONENT

3

4              I,_____ , do

5    hereby certify that I have read the

6    foregoing pages, and that the same is

7    a correct transcription of the answers

8    given by me to the questions therein

9    propounded, except for the corrections or

10   changes in form or substance, if any,

11   noted in the attached Errata Sheet.

12

13

14   _____

15   Shannon Burns                DATE

16

17

18   Subscribed and sworn
     to before me this

19   _____ day of _____ , 20____ .

20   My commission expires:_____

21

     _____

22   Notary Public

23

24

25